**ANDERSON v. ATKINSON et al.**

No. 15055.

District Court, N. D. Illinois, E. D.

Feb. 14, 1938.

854

Nichols, Morrill, Wood, Marx & Ginter and R. S. Marx, all of Cincinnati, Ohio, and Castle, Williams, Long & McCarthy, of Chicago, Ill., for plaintiffs.

Irwin Walker, Al. L. Flynn, J. E. White, R. W. Campbell, Fyffe & Clarke, Moses, Kennedy, Stein & Bachrach, Sims & Stransky, Chapman & Cutler, Carl J. Rees, Julius Kreeger, Cutting, Moore & Sidley, Levinson, Becker, Peebles & Swiren, Wilhartz, Hirsch & Schanfarber, George I. Haight, and Wilson & McIlvaine, all of Chicago, Ill., for defendants.

SULLIVAN, District Judge.

This is a suit in equity brought by A. M. Anderson, as receiver of the National Bank of Kentucky, Louisville, Kentucky, an insolvent national banking association organized under the laws of the United States. The bill of complaint was filed February 15, 1936.

In the original bill approximately sixty-four persons and corporations were made defendants, four of them being residents of the Eastern District, and one of the Southern District of Illinois. Later at various times leave has been given plaintiff to dismiss and to join additional parties, there being now approximately seventy defendants.

Motions to dismiss have been filed on behalf of various of the defendants, supported by briefs and arguments raising many questions. The immediate matter before me now for disposition is the motion to dismiss on behalf of Hallgarten & Company, Russell Brewster & Company, Farnum, Winter & Company, and Ella G. Graves.

The bill alleges that the National Bank of Kentucky, domiciled at Louisville, is a national banking association which was organized under the laws of the United States.

That on November 16, 1930, the bank was closed by resolution of its board of directors.

That on November 17, 1930, the Comptroller of the Currency being satisfied that the bank was insolvent and unable to pay its debts, appointed a receiver for same.

On December 15, 1932, this receiver resigned, and the Comptroller appointed A. M. Anderson, the present receiver, who brings this suit.

The bank had outstanding 40,000 shares, representing $4,000,000. Practically all of the shares were owned by six trustees under a trust agreement executed in 1927. In exchange for the bank stock the trustees issued participating certificates, which provided that the holders thereof should be subject to the same liability as though they were the record holders of the shares of bank stock held in trust by the trustees. The trustees held not only the shares of the bank, but also the shares of the Louisville Trust Company, apparently an affiliate institution.

That in 1929 Banco-Kentucky Company, a holding company, was organized under the laws of Delaware, to take over the shares of the National Bank of Kentucky and of the Louisville Trust Company, and also to engage generally in the business of buying, selling, and holding of bank, trust company, and other corporate shares. The Banco-Kentucky Company acquired practically all of the trustees certificates representing the shares of the National Bank of Kentucky, it having exchanged its stock of a par value of $10 per share, for stock of the bank and trust company, on the basis of two shares for one.

That it was an essential part of the plan that at least a substantial majority of the trustees certificates be owned by the shareholders through the holding company, and that the holding company should be managed and operated by the boards of directors of the bank and the trust company.

That this plan was approved and adopted by the owners and holders of 540,384 shares of the trust estate, representing 37,715 shares of National Bank of Kentucky stock out of a total of 40,000, and a similar proportion of Louisville Trust Company stock. The holding company issued 1,080,768 of its shares in exchange for these 540,384 shares in the trust estate.

That the real holders and owners of approximately 95 per cent. of the stock of the national bank and of the trust company caused this holding company to be organized as their agency and instrumentality in furtherance of a scheme to unlawfully acquire, own, control, and operate a group of state and national banks and trust companies in violation of the laws of the United States and of the Commonwealth of Kentucky. Through this corporate agency the stockholders proceeded to secure control of a group of banking institutions, and to use the

assets of the banks and trust companies in business enterprises in which the banks and trust companies were prohibited by law from engaging. The banks were required to make loans on the security of the holding company stock, in violation of the National Bank Act, 12 U.S.C.A. § 21 et seq.

That after the exchange of participation certificates for holding company stock the bank stockholders continued to be the real owners of approximately 95 per cent. of the stock of the National Bank of Kentucky and of the Louisville Trust Company, and so long as they retained their holding company stock continued to receive all of the benefits, privileges, and advantages incident to the ownership of bank stock.

That persons who appeared to be stockholders in the holding company had and exercised all the rights and privileges of shareholders in the National Bank of Kentucky and of the other banks and trust companies whose capital stock was deposited with this corporate agency.

The purpose of the bank and trust company stockholders in organizing the holding company and placing their stocks in its name was not only to expand the operation of the banks beyond the scope authorized by the laws under which the banks were organized, but they also deliberately sought to evade the provisions of the National Bank Act and of the laws of the State of Kentucky which fasten personal responsibility upon bank stockholders for all the debts of the bank to an amount equal to the par value of their bank stock. In the first step of unifying into one financial institution the National Bank of Kentucky and the Louisville Trust Company through the trust agreement of 1927, the shareholders expressly acknowledged their assessment liability. In the second step, involving the reorganization of the bank and the trust company and their business, the shareholders deliberately sought to eliminate their individual liability and to defraud the depositors and creditors of the banks of the protection contemplated by the statutes imposing assessment liability.

Banco was incorporated under the general corporation laws of Delaware authorizing it to do any lawful business *except banking*. But one of its purposes was to enable the banks to engage in speculative financial enterprises forbidden to banks. While Banco had an apparent separate existence, it was intended to be and was an agent of the banks, operated by bank officers, for the benefit of the bank stockholders. Through it the bank and trust company engaged in branch or chain banking. Its shareholders sought not only to retain but to increase their investments in bank stock and to defraud the depositors by substituting for the stockholders' personal liability only the bank stocks themselves.

The National Bank of Kentucky failed on November 17, 1930. On February 20, 1931, the Comptroller of the Currency levied an assessment upon its stockholders for $4,000,000, to be paid by April 1, 1931, and directed the receiver to take all necessary proceedings to enforce their individual liability.

Practically all of the stock of the bank stood of record in the names of six trustees. On the records of the bank, showing the ownership of the participation certificates, the holding company represented itself liable, as holder of record of about 95 per cent. of the bank's entire capital stock. In order to fully protect the interests of the depositors and creditors of the insolvent bank, and to prevent the holding company stockholders from being in any manner misled or prejudiced, the receiver, in March, 1931, notified each holding company stockholder of the assessment, the demand for payment, and that it was the receiver's intention to proceed against them to recover the assessment to the extent that he was unable to recover it from their holding company.

Failure of the bank resulted in failure of the holding company, and a receiver was appointed for it. The bank receiver secured leave from the court appointing the holding company receiver to establish by action the former's assessment claim. Suit was filed, and on September 14, 1931, a judgment was entered by the United States District Court for the Western District of Kentucky establishing the bank receiver's right to a claim in the sum of $3,772,162.40 for the assessment. Proof of claim was filed, and on December 18, 1934, the receiver of the holding company paid the receiver of the bank a dividend of $90,745.17. The holding company is hopelessly insolvent, but a further dividend in an amount now unknown is expected to be paid on this claim.

The plaintiff, the receiver of the National Bank of Kentucky, alleges that he is entitled to recover from stockholders of the Banco-Kentucky Company, as the real stock-

holders of the bank, the total amount of the assessment on the stock of National Bank of Kentucky held by the holding company, less the amount of the above dividend, and any further dividends which may be received. Each of the defendants, as stockholders of Banco-Kentucky Company, are individually liable to pay the assessment in the proportion that his shares of holding company stock bear to its total number of shares outstanding at the date of the closing of the bank.

The prayer for relief is that an accounting may be made to determine the number of shares of stock of Banco-Kentucky Company which were issued and outstanding at the date of failure of the National Bank of Kentucky; to determine the number of shares of stock of the National Bank of Kentucky represented by the trustees participation certificates held by the Banco-Kentucky Company as the agency of defendants and other stockholders; to determine the proportionate part of a share of stock of the National Bank of Kentucky which was represented by a share of stock of the Banco-Kentucky Company; to determine the proportionate amount of the assessment for which each holder of the stock of Banco-Kentucky Company is liable; to give credit to said defendants and the other stockholders of Banco-Kentucky Company for such part of the assessment as the receiver has collected or may hereafter collect. That the court fix and determine the number of shares of stock of the National Bank of Kentucky of which the defendants were the real and beneficial owners, and the assessment liability thereon; and that upon such accounting the plaintiff be awarded a judgment and decree against the defendants for the amount found by such accounting to be due from each of them.

The motion to dismiss presents three questions for consideration by the court:

First. Whether or not the court has jurisdiction as to the individual defendants against whom a recovery of less than $3,000 is sought.

Second. Whether plaintiff's remedy is in equity or at law.

Third. Whether or not defendants who were not the record holders of the bank stock on which it is sought to enforce a stockholders' double liability may be held individually liable as the actual and beneficial owners thereof.

For the purpose of testing the sufficiency of the bill of complaint, the motion to dismiss admits the truth of all the allegations therein which are well pleaded.

On the first question, that of jurisdiction: The complaint alleges that "this is a suit of a civil nature in equity brought by the plaintiff as receiver of an insolvent national bank. As such receiver he is an officer of the United States. This suit arises under the constitution and laws of the United States for the enforcement of a liability imposed by the laws of the United States, and is brought in performance of his official duties. This is a case for winding up the affairs of a national banking association."

Section 192, chapter 2, title 12 U.S.C.A. gives the receiver authority to bring this suit, providing that he "may, if necessary to pay the debts of such [National banking] association, enforce the individual liability of the stockholders."

Section 41 (1), chapter 2, title 28 U.S.C.A., section 24(1), of the Judicial Code, as amended, provides that: "The district courts shall have original jurisdiction as follows: First. Of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue."

Section 41 (16) chapter 2, title 28 U.S.C.A., gives the District Courts original jurisdiction "of all cases commenced by the United States, or by direction of any officer thereof, against any national banking association, and cases for winding up the affairs of any such bank."

The District Court is given original jurisdiction of all suits at common law or in equity, *where the United States or any officer thereof is plaintiff,* regardless of the amount involved; and the receiver of a national bank has been held to be an officer of the United States. In re Chetwood, 165 U.S. 443, 17 S.Ct. 385, 41 L.Ed. 782; Auten v. National Bank, 174 U.S. 125, 19 S.Ct. 628, 43 L.Ed. 920; Gibson v. Peters, 150 U.S. 342, 14 S.Ct. 134, 37 L.Ed. 1104; Citizens' Natl. Bank v. Citizens' Natl. Bank, D.C., 9 F.Supp. 513; Brown v. Smith, C.C., 88 F. 565; Stephens v. Bernays, D.C., 41 F. 401, affirmed by, 8 Cir., 44 F. 642; Murray v. Chambers, C.C., 151 F. 142; Studebaker Corporation v. First Natl. Bank, D.C., 10 F.2d 590; Moulton v. Natl. Bank, D.C., 27 F.2d 403.

The second question raised is whether plaintiff's remedy is in equity or at law.

■ An early United States Supreme Court case, Kennedy v. Gibson, 8 Wall. 498, 505, 19 L.Ed. 476, seems to have established the rule that an action by the receiver of an insolvent national bank, to enforce the full liability of each stockholder, must be at law, the court saying: "Where the whole amount is sought to be recovered the proceeding must be at law. Where less is required the proceeding may be in equity, and in such case an interlocutory decree may be taken for contribution, and the case may stand over for the further action of the court."

The cases of Casey v. Galli, 94 U.S. 673, 24 L.Ed. 168; U. S. ex rel. Citizens' Nat. Bank v. Knox, 102 U.S. 422, 26 L.Ed. 616, followed this ruling, as did the later cases of Hale v. Allinson, 188 U.S. 56, 23 S.Ct. 244, 47 L.Ed. 380; Broderick v. American General Corp., 71 F.2d 864, 94 A.L.R. 1359; Flash v. Conn, 109 U.S. 371, 3 S.Ct. 263, 27 L.Ed. 966; Aufdenkamp v. L'Herrison, 9 Cir., 56 F.2d 344.

In Zimmerman, Receiver, v. Carpenter, C.C., 84 F. 747, 749, the court, in commenting on the case of Kennedy v. Gibson, said: "Where the action is to recover the full stock liability, the action must be at law. This undoubtedly is true, if there are no other facts existing, requiring the interposition of a court of equity."

In Bailey v. Tillinghast, 6 Cir., 99 F. 801, 805, the court said:

"Beyond doubt the ruling that, where the whole amount of the liability is sought to be recovered, the suit must be at law, was based upon the fact that in such a case the remedy at law is adequate, and, under the provision of section 723, Rev.St. [28 U.S.C.A. § 384] the action must be brought there, and then the stockholder would be given the privilege of a trial by jury. The proposition that, where less is required, the proceeding might be in equity, is apparently made to rest upon the implication that, as the liability would not thereby be exhausted, and further proceedings might be necessary, it would accord with the principles and practice of courts of equity that, the question of liability being once determined by decree, no new suit would be necessary, but the remnant of liability could be enforced by supplementary proceedings, one or more, and thus would be promoted one of the objects of equity in avoiding a multiplicity of suits. It is said that in such case the proceeding 'may' be in equity. The implication is that it might also be at law, and this seems to give further color for the interpretation which we think the other language employed fairly imports. Further reasons might be given for according a remedy in equity in such cases. The liability of the stockholder is in the nature of a trust fund. The proceeds retain that character in the hands of the receiver for the benefit of creditors. The collection of the assessment does not finally deprive the stockholder of the sum collected. It is provisional only. The Comptroller is, by the consent of the stockholder, appointed for the purpose of determining whether contribution should be made, and, by approximation, in what amount. In most instances the first assessment can only be an approximation. But in the end, if the stockholder has been required to advance more than his proportion of the amount necessary to pay creditors in the ratio of the stock he holds to the whole of the capital stock, it is refunded to him.

"Again, while the stockholder is not concerned with the collection made from other stockholders, yet he is concerned in the question whether the others are in fact stockholders, for the measure of his own liability will depend upon that. By a determination that some stock which has been counted by the comptroller as the basis of his assessment is not valid stock, and so not assessable, his own share must eventually be increased. Indeed, in the present case some of the defendants on various grounds are seeking by cross bill, alleging frauds and circumventions practiced on them, to exonerate themselves from the character and liability of stockholders. The receiver, so far as this attempt is concerned, represents all the other stockholders who are interested in retaining them. The facts that the receiver as the representative of the creditors is seeking to recover a trust fund, and that there is a complication of interest in the questions and matters involved, furnish additional grounds for holding that a bill in equity is an appropriate method of procedure wherein to litigate the matters in controversy. But it is not necessary to rest the equitable jurisdiction over the case upon that ground, for we are clearly of opinion that the bill should be maintained [in equity] for the purpose of avoiding a multiplicity of suits. In considering this phase of the general question, the other point we have just considered is not material; that is to say, whether such a pro-

ceeding as this is an appropriate one, considered independently of the peculiar doctrine applicable under that branch of equity which includes its function for preventing a multiplicity of suits. For this latter purpose it is immaterial whether the suits to be avoided or prevented are of a legal or an equitable character. The object is the same in either case, and the reason for the proceeding is the same. * * *

"And these circumstances, namely, the great number of the parties on one side or the other, the identity of the questions of law, and the similarity of the facts in the several controversies between the respective parties, are the basis on which the jurisdiction rests. The object is to minimize litigation, not only in the interest of the public, but also for the convenience and advantage of the parties. If the receiver was compelled to bring separate suits, it would entail a vast expense upon the fund in trying over and over again the identical questions of law and fact with each stockholder, and with no substantial advantage to him, but injury, rather, in the increased cost in the immediate suit, and the larger burden upon the fund, created by the many suits against the others."

In the case of Brown v. Allebach, C.C., 156 F. 697, 700, the receiver brought suit against stockholders to recover unpaid stock subscriptions, and defendants claimed that the plaintiff had an adequate remedy at law. The court there said: "In this case the defendants are very numerous, the amounts collected are comparatively small compared with the total of indebtedness and the expense of receivership, and we think it is a case where it is 'for the real and substantial convenience of all parties that jurisdiction in the case should be assumed' to prevent the expense which would naturally follow the collection of these amounts in suits at law. The record costs of separate suits at law; the expense of the receiver, and the fees of attorneys to contest these cases could easily result in requiring that another small assessment be made to meet these expenditures as well as for the accumulated interest resulting from a failure to expeditiously collect the amounts and liquidate the claims. We think, therefore, this is a case where the convenience of all parties and the inadequacy of the legal remedy under the circumstances require that equity shall take jurisdiction to prevent a multiplicity of suits; there being a community of interest among the defendants in

a number of questions of law and fact involved in the general controversy."

In Alsop v. Conway, 6 Cir., 188 F. 568, 576, a case involving the collection by a receiver of a 100 per cent. assessment against the stockholders, the court said: "A suit in equity may, in proper cases, be maintained on the ground not only that a trust fund is sought to be recovered, and that there is a complication of interest in the questions and matters involved, but for the purpose of avoiding multiplicity of suits. Bailey v. Tillinghast, supra."

In Hale v. Allinson, 188 U.S. 56, 23 S.Ct. 244, 252, 47 L.Ed. 380, cited by both sides in the pending case, the court said:

"Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not in all cases enough to sustain it. It might be that the exercise of equitable jurisdiction on this ground, while preventing a formal multiplicity of suits, would nevertheless be attended with more and deeper inconvenience to the defendants than would be compensated for by the convenience of a single plaintiff; and where the case is not covered by any controlling precedent the inconvenience might constitute good ground for denying jurisdiction.

"We are not disposed to deny that jurisdiction on the ground of preventing a multiplicity of suits may be exercised in many cases in behalf of a single complainant against a number of defendants, although there is no common title nor community of rights or interest in the subject matter among such defendants, but where there is a community of interest among them in the questions of law and fact involved in the general controversy."

In Wyman v. Bowman et al., 8 Cir., 127 F. 257, the court said:

"There is no hard and fast rule by which jurisdiction in equity on the ground of the avoidance of a multiplicity of suits may be determined.

"But whenever there is a common and decisive point of litigation between a complainant and several defendants separately liable either at law or in equity, the complainant's remedy at law is not as prompt, practical, and efficient to attain the ends of justice as the suit in equity, the convenience of the complainant is not overcome by the greater inconvenience to the defendants of a single suit, and suit in equity against all the defendants will avoid several actions at law or suits in equity involving similar questions, the jurisdiction of a court of equity may be successfully invoked.

"A bill to collect unpaid subscriptions of nine defendants separately liable at law may be maintained on the ground that it avoids a multiplicity of actions at law, where the defendants have a community of interest in the questions of law and fact presented by the controversies, and the convenience of all parties will be better subserved by determining these questions in a single suit in equity than by deciding them in nine actions at law."

In commenting on the case of Hale v. Allinson, supra, Judge Sanborn, in the opinion in the Wyman v. Bowman Case, supra, said:

"Why does not this suit prevent a multiplicity of actions at law, and give to the complainant a more efficient and practical remedy, without inconvenience to the defendants, than nine separate actions at law could give? The remedy at law which will preclude the maintenance of a suit in equity must be 'plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.' * * *

"Would nine actions at law, in which the same questions of law and fact would be tried nine times upon the production and reproduction of the same evidence before nine different juries, be as efficient and prompt or as practical a means to determine the questions here at issue, and to attain the ends of justice, as this single suit in equity? The question is its own answer. Is there any deeper inconvenience to the defendants than would be compensated for by the convenience of the plaintiff in pursuing this remedy? None is proved; none can be conceived. Indeed, the single suit in equity entails less expense, less labor, and less trouble upon the defendants by as much as it is less expensive and troublesome to try a single suit in equity than it is to try nine actions at law, involving the same controversies, conditioned by the same evidence. The defendants have a common interest in every material question of law or of fact involved in the controversy in this suit. The remedy of the complainant by this proceeding in equity is far more efficient, prompt, and practical to attain the ends of justice, and much less expensive and inconvenient to all the parties to the controversies, than nine actions at law would be. The case falls far within the principle that a suit in equity may be maintained to avoid a multiplicity of actions at law."

In Hayden v. Thompson, 8 Cir., 71 F. 60, 63, where the court, in discussing equity jurisdiction concerning a multiplicity of suits, said:

"It avoids a multiplicity of suits, for, if this suit cannot be maintained, the receiver must bring a separate action at law, and have a separate trial by jury, of 24 actions, one against each of the shareholders who are appellees herein, to recover the dividends for which this suit was brought. These 24 lawsuits constitute the adequate remedy at law, which, it is argued, prohibits the maintenance of this suit in equity. But the remedy at law which will preclude the maintenance of a suit in equity must be 'plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

"Would these 24 actions at law be as efficient, as practical, and as prompt to attain the ends of justice as this suit in equity? The question is its own answer."

In the case of Reconstruction Finance Corp. v. Central Republic Trust Co., D.C., 11 F.Supp. 976, at page 982, Judge Wilkerson said:

"Defendants urge that this suit is not one which may be maintained in equity in a federal court. In considering this objection we look, of course, not to local laws or rules of decision, but to the uniform principles, rules, and usages of equity as administered in the federal courts. Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856; Pusey & Jones Co. v. Hansen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763;

Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447.

"No principle of equity jurisprudence is superior to that stated by Chief Justice Fuller in Union Pacific Ry. Co. v. C. R. I. & P. Ry. Co. 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265: 'It must not be forgotten that, in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies "so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated," and "has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." Pom.Eq.Jur. § 111.'

"Is the power of a federal court of equity broad enough to cover a suit of this kind? Or is the court obliged under the principles announced and the rules prescribed by the Supreme Court to follow the restricted view of equity jurisdiction advanced by the defendants? It is my opinion, after giving consideration to the decisions which are binding on this court, as well as those which are persuasive, that this suit may be maintained on the equity side of this court." Citing cases.

In my opinion there is a community of interest between the defendants on all of the material questions of law and of fact involved in the instant case. Surely the proceeding in equity is more efficient, prompt, and practical to attain the ends of justice, and much less expensive and inconvenient than would be approximately one hundred actions at law; and I therefore hold that this suit may be maintained on the equity side of the court.

This brings us to a consideration of the third question: Whether or not defendants may be held to be the actual and beneficial owners of the bank stock, and thus be held individually liable.

Section 64 of title 12 U.S.C.A. provides: "The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock."

Defendants urge that because the receiver of the bank originally brought a suit against the Banco-Kentucky Company, the holding company, for double assessment, on the ground that it was the record owner of the bank stock (Laurent v. Anderson, Receiver, 6 Cir., 70 F.2d 819, 823), recovered judgment against the holding company, and collected approximately $90,000, he is now estopped from seeking to disregard the corporate entity of the holding company and enforcing the assessment against the present defendants as the actual and beneficial owners of the stock.

I agree, however, with plaintiff's contention that the issue in the present case on the liability of the individual stockholders of the holding company was not raised or considered in the Laurent Case, supra. The question there before the court was the liability of the Banco-Kentucky Company; and the court held that it, the Banco-Kentucky Company, was liable, first, because of its agreement to pay the double assessment; and, secondly, because it was the record owner of the bank stock.

In my opinion the judgment against the Banco-Kentucky Company does not constitute res adjudicata, neither does it constitute estoppel against the plaintiff in the instant case, so as to prevent him from maintaining a suit against the real and beneficial owners of the bank stock.

In Lyon v. Perin & Gaff Mfg. Co., 125 U.S. 698, 8 S.Ct. 1024, 1025, 31 L.Ed. 839, the Supreme Court announced the rules which govern the doctrine of res adjudicata: "It is well settled that, in order to render a matter res adjudicata, there must be a concurrence of the four conditions, viz: (1) Identity in the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality in the persons for or against whom the claim is made."

The parties defendant in the present case bear no identity to the parties in the Laurent Case, and the enforcement of the liability against the owners of the stock of the holding company as the real and beneficial owners has not previously been presented to or considered by the court.

There can be no estoppel by judgment unless there is identity of parties in

the two suits. Bigelow v. Old Dominion Copper Co., 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009, Ann.Cas.1913E, 875; Troxell v. Delaware L. & W. R. Co., 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586.

In the case of Laurent v. Anderson, supra, the court held that "the stockholder's double liability is not contractual, but is imposed by statute as an incident of ownership."

Many cases have discussed the question of who may be treated as the real owners of bank stock, and consequently might be held liable for the double assessment.

In Pauly v. State Loan & Trust Co., 165 U.S. 606, 17 S.Ct. 465, 470, 41 L.Ed. 844, the Supreme Court said:

"That the real owner of the shares of the capital stock of a national banking association may, in every case, be treated as a shareholder within the meaning of section 5151 [12 U.S.C.A. § 63]. * * *

"That if the real owner of the shares transfers them to another person, or causes them to be placed on the books of the association in the name of another person, with the intent simply to evade the responsibility imposed by section 5151 on shareholders of national banking associations, such owner may be treated, for the purposes of that section, as a shareholder, and liable as therein prescribed. * * *

"The courts will look at the relations of parties as they actually are, or as, by reason of their conduct, they must be assumed to be, for the protection of creditors. Congress did not say that those only should be regarded as shareholders, liable for the contracts, debts, and engagements of the banking association, whose names appear on the stock list distinctly as shareholders. A mistake or error in keeping the official list of shareholders would not prevent creditors from holding liable all who were, in fact, the real owners of the stock, and as such had invested money in the shares of the association. As already indicated, those may be treated as shareholders, within the meaning of section 5151, who are the real owners of the stock, or who hold themselves out, or allow themselves to be held out, as owners in such way and under such circumstances as, upon principles of fair dealing, will estop them, as against creditors, from claiming that they were not, in fact, owners. * * *

"And let it be observed, the liability upon shareholders is to the extent of the amount of their stock at the par value there-

of 'in addition to the amount invested in such shares.' The word 'invested' plainly has reference to those who originally or by subsequent purchase become the real owners of the stock, and cannot refer to those who never invested money in the shares, but only received the certificates of stock, or it may be the *legal title thereto.*"

In Ohio Valley National Bank v. Hulitt, Receiver, 204 U.S. 162, 27 S.Ct. 179, 181, 51 L.Ed. 423, the court said: "Assuming, then, the established doctrine to be that the mere pledgee of national bank stock cannot be held liable as a shareholder so long as the shares are not registered in his name, although an irresponsible person has been selected as the registered shareholder, we deem it equally settled, both from the terms of the statute attaching the liability and the decisions which have construed the act, that the real owners of the shares may be held responsible, although in fact the shares are not registered in his name. *As to such owner the law looks through subterfuges and apparent ownerships and fastens the liability upon the shareholder to whom the shares really belong.*"

In Christopher v. Norvell, 201 U.S. 216, 26 S.Ct. 502, 506, 50 L.Ed. 732, 5 Ann.Cas. 740, the court held: "The statute, in effect, says to all who become owners of national bank stock, no matter in what way they become shareholders, *that they cannot enjoy the benefits accruing to shareholders, and escape liability for the contracts, debts, and engagements of the bank.*"

In the case of Corker v. Soper, 5 Cir., 53 F.2d 190, 192, the court said:

"Appellant devotes a large portion of his brief to the contention that the Laurens Company was a real corporation, validly organized and validly existing, and that, in view of the frankness with which the purpose to avoid liability was avowed, and the things to accomplish that purpose done, there is no warrant here for disregarding the corporate character of the Laurens Company in order to hold its incorporators liable.

"Appellant's troubles do not arise from the fact that the corporate entity of the Laurens Company has been disregarded. The judgment of the court below fully recognized and gave effect to that entity. It found that, though it did in fact exist, it existed as a mere creature organized and maintained for the purpose of holding, not really, but as agent for appellant, the stock

which he caused to be put in its name, that appellant at all times remained the real owner of the shares, and that the law will look through the subterfuge of pretended ownership to fasten liability upon the shareholder to whom, in fact, the shares belong."

Metropolitan Holding Company v. Snyder, 8 Cir., 79 F.2d 263, 266, 103 A.L.R. 912, is a case where the stockholders of a bank stock holding company were held liable to an assessment on that proportion of the bank stock which their stock in the holding company bore to its total capital. The receiver claimed that the defendants were the beneficial owners of the bank stock, and defendants contended that there was no thought of escaping personal liability in organizing the holding company; that they had a legal right to organize it; and that it could legally hold bank and other stocks under the laws of Missouri. In other words, that the holding company became the actual owner of the bank stock and the defendants were merely the stockholders of the holding company. In deciding this case the court said: The provisions of the National Bank Act for assessment liability were "enacted primarily for the benefit of the creditors of the national banking associations. The so-called double liability of shares of national bank stock prompts the public to select banks of this character with which to do business in preference to other institutions which do not have this additional stock liability. If the contentions of the appellants are correct, then the organization of this holding company had the effect of circumventing section 5151, Rev.St. [12 U.S.C.A. § 63]. The ownership of this 720 shares of stock carried with it the responsibility of this additional liability, and to say that the individual appellants by their own initiative could take the title to this block of stock from the Vandeventer Securities Company, and practically suspend this statutory liability by placing title in a corporation, the only asset of which, at the time, or ever to be, was this block of stock, would be to render the provisions of this statute a complete nullity for all practical purposes. To deprive the creditors of a national bank of their statutory protection by such a method is wrong and the courts will not countenance the interposition of a mere corporate shadow to conceal who are the actual and beneficial owners of bank shares. To permit individuals to circumvent the contingent liability under this statute by simply organizing a corporation for the purpose of holding shares would set up a device against which the statute would ever afterwards be ineffective."

Barbour v. Thomas, 6 Cir., 86 F.2d 510, 516, is a like case, where a holding company was organized and issued its shares in exchange for the shares of bank stock originally held by the stockholders of the bank. In deciding this case, the court said:

"We have proceeded upon the assumption that appellants were stockholders of the bank. They insist that they were not, that they had exchanged their certificates for those of the holding company, the stockholder of record. Ninety-one and three-tenths per cent. of appellants were signers of the 'Agreement and Power,' and owners of their holding company stock by original exchange, one-half of one per cent. obtained their stock in exchange for the stock of others as subsequently acquired institutions. The remainder obtained their certificates in other ways. But the statute (12 U.S.C.A. § 64), does not restrict liability for assessments to stockholders of record or to those holding certificates. Congress wisely declined to limit the term 'stockholders.' It recognized that bank stock is capable of ownership without any certificate therefor having been either issued, recorded, or delivered; and, further, that stock might be owned by one person and the certificate registered in the name of another. * * * It has been uniformly and wisely held that the actual owners of the capital of a national bank, that is, those who have their money invested therein, are 'shareholders' and liable to assessment. * * * The law fixes the obligation upon those who profit from the confidence of the depositors and from the use of their money.

"We concur in the finding that appellants are 'actual owners' of the stock of the bank upon which the assessment was levied. The stockholders never sold their stock. They simply exchanged it for holding company shares. The holding company certificates represented the interests which the shareholders of each unit held or acquired in the assets of the group."

The facts involved in the Detroit case and the instant case are very similar. The holding company in Detroit and the holding company in Kentucky were organized at practically the same time. Banco-Kentucky was incorporated in July, 1929. The Detroit holding company was organized in Oc-

tober of the same year. Both holding companies were organized for identical reasons—that is, as bank holding corporations.

In the Barbour Case, supra, the court stated that the formation of the Detroit Bankers Company (the holding company) was the result of the thought "that smaller independent banks were at a disadvantage in competing for the business of large concerns with huge monetary requirements." And then goes on to state that "the organizers were also impressed with the possibilities of more economical control and operation of group units through the elimination of duplicating facilities." In the organization of Banco-Kentucky the purpose and plan was identical with the Detroit company, as was control of the holding company by the shareholders of the bank, control of selection of directorate of holding company, acquisition of unit banks, and distribution of dividends. The court pointed out in the Barbour Case that the plan of organization of the holding company contained restrictions upon the persons who might be elected as directors. These restrictions were included so that there would be no change in the directorate of the banks as a result of the organization of the holding company. In the Kentucky case (the case here under consideration), it was specifically provided that the holding company was to be managed and operated by the board of directors and officers of the two banks.

All of these facts are set forth in the bill of complaint, and admitted to be true by reason of defendants' motion to dismiss.

In Continental Nat. Bank & Trust Co. of Chicago v. O'Neill, 82 F.2d 650, 651, decided by the Circuit Court of Appeals for the Seventh Circuit, it was held that: "Bank receiver was not estopped, by reason of prior pleadings and choice of defendant, from suing trustee to recover a bank stock assessment by fact that he had previously sued settlor, where pleadings in respective suits were reconcilably consistent, true facts were stated, and complexity arose merely because of legal conception of division of ownership into legal and equitable."

■ I am of the opinion that the defendants here are the actual owners of the stock held in the name of the Banco-Kentucky Company, and therefore are liable for the double assessment provided for by the statute.

Defendants' motion to dismiss is overruled.

The reply brief of certain defendants argues that plaintiff's position in this case amounts to this: A receiver for a national bank may not only recover from the record holders of the bank stock, and in addition recover from the real and beneficial owners thereof, but if that real and beneficial owner is a corporation, then the stockholders thereof are also liable.

I believe that may be done if that corporation, as in the instant case, is one which was organized and maintained solely for the purpose of holding the bank stock represented by the participating certificates.

The bill alleges that the Banco was organized for the purpose of holding the trustees' participating certificates in furtherance of a plan to permit the real owners thereof to avoid their statutory liability thereon. The bill also alleges that the holding corporation was organized for the purpose of defrauding the depositors and creditors of the bank of the protection contemplated by the statutes imposing the statutory liability.

■ The entire assets of the holding company consisted of the trustees' participating certificates, which in turn represented the stock of the Kentucky National Bank and its affiliate. Every one dealing in the stock of Banco was bound to know what its assets consisted of, and knowing that such assets were the trustees' participating certificates which represented the stock of the bank, they were then bound to know that a statutory liability was imposed on such stock. I believe that the court may look through this entire involved financial structure, and hold the owners of all stock to be holders of stock in one unified financial institution, and therefore liable for the statutory assessment.